Can I please the court, your honors? My name is Howard Marks. I represent a minor, which is KCR, through her mother, Roseann Gill. This is a case that stems from a warrantless entry into the home to arrest a minor. She was 12 years old on October 14, 2013. A little bit of a background. There was a minor that had committed suicide approximately a month earlier in September. We are familiar with the tragic facts. We really are. I say that not to be rude and cut you off, but to give you more argument. I appreciate that, your honor. The case, we filed a case. The judge on the motion to dismiss order found probable cause, which resulted in the majority of the claims being dismissed with prejudice. The only two remaining claims were the warrantless entry into the home for the arrest on a Monalva County claim, Sheriff's Office, and McKinney. The Sheriff's Office claim was resolved against us on summary judgment, so we proceeded to trial on the sole issue of whether or not there was consent by my clients for Mr. McKinney, Detective McKinney, as well as the other three officers entering the home on that day. I believe under the case law clearly set forth in this circuit, you cannot do a warrantless arrest in a home using some implied consent to the extent it's even applicable. Most of the cases that have come out of this court recently have said implied consent is not applicable to entry into a home. There was no dispute in this case that there was no verbal consent. I'm not sure that they've said that to the exclusion of someone stepping back and allowing the law enforcement officers to enter. Are you? Well, the older case, U.S. v. Edmondson, there was no implied consent when an individual stepped back to a show of authority. In this case, we have . . . In this case, they didn't know if the guns had been drawn or not was the issue. In our case, we had three law enforcement officers armed with bulletproof vests at the front door, and that was a show . . . I argue that's a show of authority. You don't arm with bulletproof vests. You defend with bulletproof vests. I thought in Edmondson there was a genuine issue of material fact as to whether the officers had the guns drawn. I guess there was a finding that they had the guns drawn. Am I wrong? Your Honor, I thought there was a finding there was no evidence that the guns were seen. Okay, we can check that. I'll have to double check that. You're right. There's some dicta in some of the cases saying that the implied consent doesn't apply with respect to the home, but we've got holding in Holmes and Ramirez-Shillel where implied consent is actually bound to be consent at the threshold of the . . . I'll distinguish those. I'm sorry, Your Honor. The Ramirez-Shillel case was a 2002 case decided by the circuit, and the Holmes case was a 2003 case decided by the circuit. In those cases, they were asked to come in. There was, can we come into your home? There was nothing like that in this case. In fact, in one of the cases, there was a signed consent form after the fact, and they were even disclosed to them. You didn't have to agree. It seems to me that there's even more indication of consent here because McKinney came to the child, and the father says, can you give me a minute to put up the dog? He closed the door and goes to put up the dog, and then he comes back and opens the door wide and steps back. It seems to me when he said, give me a minute to put up the dog, that is in effect saying, you can come in as soon as I get the dog so he won't bite you. That was an issue of dispute of fact, but assuming the jury found that, that that was in fact true, even the district court said the fact that he opened the door two times does not necessarily mean there was consent to open. They knocked on the door loudly, entered the porch, said we're here, Polk County Sheriff's Office, they opened the door, we're here to arrest your daughter. Under McKinney's position, they went back and put the dog away, and he came back and opened the door. All the testimony was he still had his hand on the door. This is a mobile home. I'm not sure they say he stepped back. He said he just opened the door. In McClish case versus Nugent, which was a 11th Circuit 2007 case, there was no implied consent in that case, and that was a doorway where the officers reached in and pulled someone out from a doorway. You can't physically extract somebody from the house and say that was voluntary. I apologize, Your Honor? In the case you're talking about, the one Judge Marcus wrote, a cop reached in and pulled the guy out and said, okay, you're no longer in your house, I'm going to arrest you. They found that to be a wrongful arrest, that that was a . . . Of course it is. He reached in the house, didn't say may I come in, didn't say I'm here to arrest somebody, and the guy stepped back. He reached in, grabbed him, and extracted him from the house. That's very distinguishable. I understand your argument about the other cases, but when they said we're here to arrest your daughter, basically, the consent to be valid has to be informed, doesn't it? That's to be voluntarily informed consent. Right, and the informed component of that, they have to know why the officers are asking to enter the house, right? They didn't even say they were entering the house. They just said we're here to arrest your daughter. No, I know, but if he's going to consent to the officers entering the house, and it's going to be knowing, he has to know why the officers want to enter the house. Well, I also typed the Shepard versus Davis case . . . No, no, no, no. Wait before we go to another case. Consent has to be informed, right? Yes. Informed of what? The purpose for which they want to enter the house. And also, what about your rights? No, no, no. Counsel, talk to me about this. Before a consent can be valid, the person who gives the consent has to know what purpose the entry is for. And the only way he can know that is if the police officers tell him. So by saying, we're here to arrest your daughter, that was informing him of why they wanted to enter the house, wasn't it? Your Honor, I don't . . . I'd say it was informing him why they were there, not on entering the house. They didn't say, shall we enter the house to arrest your daughter? Shall we come in? No one said that. There was no verbal communication at all. So they might have been there for one purpose, but wanted to enter the house for another? Who said they were going to enter the house? One thing, they could have just had them try to have the daughter brought up. They had four law enforcement officers that went into the house. So he didn't know they were going to enter his house? A jury couldn't find under the circumstances that he knew they were trying to enter the house? I don't think that's implied consent under the case law. I'm not asking you if it's implied consent. I'm asking you if a jury could have found under all the circumstances that he, Mr. Oman, knew why they wanted to enter the house after they had said, we're here to arrest your daughter. I think a jury could have found anything like they did, Your Honor. I think as a matter of law, there was not a voluntary consent. Counsel, if you don't engage me on the question, it's not going to help me. I'll just let you have your time and not tell you what I'm bothered by about your case like I'm going to tell them. But the reason I'm telling you this is not to argue with you. It's to give you an opportunity to confront my concerns and try to alleviate them so I can rule in your favor. The point, you make the point, is it was a command. We're here to arrest your daughter. I'm suggesting to you the counter-argument, which I'd like your view on, is it's also informing Mr. Roman why they were there and why they wanted to enter the house. And your response is? My response is, Your Honor, I don't think it said enter the house. They were there to arrest him. That informed me. If a jury could believe that because he opened the door a second time that they were going to come in to arrest, that really wasn't the evidence. They just said they believed they had implied consent as a result of him opening the door and stepping back. And I don't think that is legally sufficient under the case law, certainly in the Eleventh Circuit. You don't have to have a best case. And I used to hate these questions when I was an attorney. But what's your best case for opening the door and stepping back is not implied consent to enter? The Sheppard v. Davis, no implied consent, open the door and not objecting. The Moore v. Peterson case, that was another case that was decided where that was a 2015 case. And in Moore v. Peterson, there was no consent to enter the house where they stood in front of the suspect and stated he was under arrest. He was going to be arrested. That is no different than what we have here. In fact, it's almost right on point. They knocked on the door. There was no consent. The defendant opened the door. They said, we're going to arrest you. At that point in time, I think the defendant turned around or something and had himself handcuffed. The court found that that wasn't sufficient implied consent. In this case, we don't just have somebody in the doorway. We have someone, we're here to arrest your daughter, and then they enter into the home, which I think is even more egregious than the Moore v. Peterson case that was decided by the 11th Circuit. What should they have told Mr. Roman when he opened the door? They should have had a warrant, Your Honor. No. I mean . . . He wouldn't be here if they did. What should they, warrantless they, have told Mr. Roman? Are you saying there's nothing they could have told him or asked him that would have made the consent voluntary or would have justified the conclusion that there was consent? If they engaged in conversation, assuming that they had a right to be there to begin with, if they engaged in conversation, we're here to arrest your daughter, can we come inside, talk to your daughter, and get her arrested without incident, can we do that? That would have been probably, and he says, okay, that's fine. But this is also, earlier in the day, about seven hours earlier, they called to ask to bring their daughter in. And this is uncontested testimony. The mother said, no, we're not going to bring the daughter in. We've already talked to her many times, and if you're going to make a decision to arrest, let us know, and we will arrange it to get brought in. I mean, that in and of itself should have let them know that certainly the mother was in the house at the time in consent. And then once the officers went into the house, when the mother was screaming, don't take my baby, don't take my baby, that would also be an indication, hey, don't be in my house and take my baby. I mean, there was nothing. I could speculate a lot of different things they could have done, but there's no rationale for why they waited seven or eight hours, actually a month they had to do this investigation, and decided not to get a warrant. Mr. Marks, before you sit down, I want to just turn you to the probable cause issue. So as I understand it, so we have the arrest and then we have the warrant. And your argument is, on the face of the warrant, there's no indication that McKinney had the probable cause at the time of the arrest. No warrant, Your Honor, on the face of an incident affidavit, which he used for probable cause. There was no warrant ever issued in this case. Oh, okay, okay. One of the issues, it was like a two-page affidavit he did after the fact and basically had some legal conclusions in there, no any specific facts on what she did, and we alleged in the complaint that there was statements in there were falsified, statements in there were materially omitted that he did, and that he ultimately makes this legal conclusion that something that my client may have done seven months earlier was a factor in this teenager committing suicide. There was nothing in the affidavit that supplied sufficient evidence for probable cause, and even if there was, we argued that there are misstatements and false statements in the affidavit. We should not have had to lose that on a motion to dismiss. What the judge did was basically gutted the case and left us with essentially just the warrantless entry into the home case. Is there something in the record that says how long after the arrest this, I'm calling it a warrant, you're calling it something else, but when it was obtained, how many hours after the arrest? It was, I don't remember now, but it was substantially after. Oh, it was that same day, I think. I think it was the same day. I'm not positive. There was a time period, he said the date of the arrest, there was a two-page document, I think he used the date of the arrest, maybe he had this beforehand, I don't remember, to be honest with you. I think he filled it out earlier, and then he had this one-page document, which is his affidavit, which attaches to the claim. Just hypothetically, if we thought you were right about that, you're asking for a new trial on that basis? Absolutely not. Well, not even a new trial, we didn't even have a trial on that, just remand on those issues. Again, the judge assumed probable cause, so the only issue left for the jury was consent, because we didn't get into probable cause. You said that Judge Scriven assumed probable cause? She ruled probable cause on a motion to dismiss, and that basically eliminated all the false arrest claims, and all the claims that probable cause would be an element or a defense for, so the only thing left that we actually tried was, even if there was probable cause, there was no warrant or consent to enter the home for the arrest. If you look at the one-page document, it's two pages, but the second page is the one that has some language in there. There was no factual allegations in here that even supported aggregated stalking. There's no analysis of what was done. I thought they said that calling her names and intimidating her, starting a fight with her, she didn't fight back, but that KCR continued to do it, and so forth and so on. It was calling names, which I don't think is wise to level a statute. Two girls did get in a fight a year earlier, and the information was both of them were suspended. We don't know who fought it. I don't know what it says on that. That is something we disputed, and that's it. Constant bullying. She confessed during her interview that she, quote, bullied, end of quote, the victim by calling her names and intimidating her. Your Honor, if you listen to that entire video or audio, you can call whatever bullying. Whatever she said did not meet the standard of an aggregated stalking charge, which means you have to intimidate somebody. It means you have to threaten somebody. This is schoolyard stuff. I think the suicide would probably establish that the victim was intimidated, don't you? Not seven months after the fact that my client had no contact with. It is undisputed my client had no contact with her from February 2013 to the date of the suicide in September 2013. Undisputed. No text messages, no conversations, no postings. You had no conversation with her after when? After what date? After February 2013, there's nothing. Well, the affidavit says she stated, your client stated that she and her mother, Roseanne Gill, went to the victim's residence on September 10, 2013. After the suicide. They went to express regrets to the mother. Oh, you're saying she had no conversations with the victim. Yes, Your Honor. There was no contact, no conversations, no communications, no text messages, and this affidavit all said someone else was doing it at the same time. So I think it's quite a leap to get to the point of, you know, that this was a contributing factor to the suicide when seven months went by and there was zero communications from my client, plus we dispute a lot of the statements in the affidavit. For what it's worth, before I forget, I have a copy of the affidavit and it is dated sworn and subscribed before me this 14th day of October 2013. Which was the date of the arrest. So they had the affidavit sometime. I'm sorry, they swore and subscribed to it before, as Jonathan McKinney did it, on the 14th day of October 2013. Yeah, this, I think there was a later report that I'm thinking of, but yes, it looks like he had this and they were going to attempt, this is what they predicated their probable cause on. Didn't go put this for a warrant, didn't ask for a warrant, didn't do anything. This was all that we know of he had as of the day. And he had made a decision before he went to the house that there was going to be an arrest. This was not a knock and talk situation. We don't even believe he had a right to be there. And the other, I think, critical issue in this case, the porch became a huge issue, Your Honor. And it wasn't an issue that we necessarily injected into the case. But even in the McClish case, there was also a porch and the court decided not to deal with it at that time. Mr. Marks, we've let you go way over. Let's hear from you now. Thank you, Your Honor. The jury question answer, I think, was highly prejudicial. Thank you. May it please the court. Hank Campbell on behalf of Sheriff Judd and Detective McKinney with me as Sheriff Judd has been on counseling and Gibson at the table. As to the Edmondson case, and I would agree with Judge Anderson, this case has substantially more facts indicative of implied consent than any of the cases we cited out of the Eleventh Circuit, Ramirez, all of the cases. The suggestion that Edmondson is closer on the point, Judge Carnes, your comment was correct. In reading from Edmondson and the facts, the FBI showed up at the house of the plaintiff in this case, or the defendant in this case. With weapons drawn and with the vicinity in front of the apartment surrounded, the agents knocked on the door and saw Edmondson look out of the window. At this point, an agent yelled, FBI, open the door. Edmondson opened the door, stepped back, and placed his hands upon his head. Those facts are far afield from this case, and the facts of our case are so much stronger, and almost all of them are completely uncontested. First of all, this is a situation that had been going on for some time between Detective McKinney and this family. In fact, he had already interviewed this youth and her father at the father's other home, previously been allowed in the home to interview the juvenile. That day, there was the prior phone conversation. When they were asked to come down to the sheriff's office, they declined, and Detective McKinney told them, we're going to arrest your daughter. They then came to the house after this affidavit was filled out. Detective McKinney testified and asked about this. Yes, ma'am. The only problem, Your Honor, if I may, is when I did the arrest affidavit, I did it at the time. I put the time that I completed the arrest affidavit. That was in the afternoon prior to the trip to the house to make the arrest. This affidavit, according to the only testimony in the case, and as Judge Korns pointed out, they're actually two times on the front, and I'm not sure what the distinction is, but both of them are in the afternoon. This affidavit was done prior to the arrest. They approached the door. Can I just nail that down? It says date and time of arrest, October 14, 2013, at basically 4 p.m. The testimony at trial was actually 6 to 8. Later. Okay. Then it says the person swearing has just and reasonable grounds to believe that on October 14, 2013, at approximately 2 p.m., this child committed the offense of aggravated stalking. Yes, this form is used either to show the date and time of the arrest or the date and time of the incident. Lots of times the incident is an immediate thing, and so Detective McKinney did explain that his date and time, where it's got date and time of arrest or incident, that's actually meant to be the arrest, not the actual time of the incident. The incident had actually occurred during months of their 6th grade year as set forth in the affidavit. Okay. That clears that up. And all of that's addressed by Officer McKinney in his trial testimony. Okay. Thank you. They approached the door. It's not dark, but it's dusk. They're in plain clothes, unmarked vehicles, no lights and sirens, bulletproof vests clearly identifying who they are. They knock and announce, Polk County Sheriff's Office. There are three of them, and Lieutenant Rudd is somewhere behind them a little ways back. All of this is uncontested, by the way. Mr. Robin comes to the door, opens the door, and is informed at that point, we are there to arrest Kay, your daughter. At that point, the three contested matters as to what occurred at that front door that the jury heard and clearly could determine which story was correct occurred. According to Detective McKinney and the other officers, Mr. Robin then said, can you give me a minute to put the dog up? One of them said, he said, can you give me a minute to secure the dog? They did. He closed the door. A huge factor. If we're looking at the totality of the circumstances as to whether or not this was a consensual, whether implied or not expressed, the totality of the circumstances as this court has required, that is a huge factor found in none of the cases, and they waited several minutes while he put up the dog. By the way, he did admit there was a dog in the house. He just declined to, he stated that he did not recall anything about going to the door twice. So they wait several minutes. He then returns. He opens the door wide open, steps back, holding near the top of the door, all the way back, completely fitting this court's many decisions, and I prefer Ramirez first, that this was absolute nonverbal body language indicating consent. This is the yield-the-right-of-way of a number of your cases that we have cited in this, which in those cases, that's virtually the only fact that occurred that allowed the implied consent to be determined. The officers then entered the home one at a time in a line. There was never an objection, never a question, never a hesitation, according to the testimony. No one was ever touched. The door was not even touched. There were no threats, no gestures, nothing. Now, appellant likes to try to mix up consent of arrest versus consent of entry, because later the mother did come from the back and said, please don't take my daughter, or something to that. That's clearly objecting to the arrest. That has nothing to do with the entry, which has already occurred prior to that fact. In this particular case, if we go all the way back to the pleadings themselves, this consent issue isn't even in the pleadings. We submitted, unsuccessfully, a number of times. Judge Scriven denied our motions, disagreed, found that the fact that consent is mentioned one time in the complaint, paragraph 55, which is in the false arrest state court claim count, and is not realleged in count 10, the federal claim, they do say that they didn't consent to the prior actions of the false arrest. There is never any suggestion of lack of consent of entry until we get to the trial and the discovery leading up to the trial. The porch issue is even worse. What difference does it make that they didn't raise the consent issue until pre-trial discovery? Your Honor, because we moved one to dismiss, because it didn't state a cause of action for lack of consent. Can't review that. We've had the trial. It's kind of like people tell me it might be time to get over that. We also moved for judgment on the pleadings. It's somewhat ironic, I would suggest, that Judge Scriven, if you read the transcript and you see her very strong involvement in this case, it's fairly ironic that Judge Scriven, who I would suggest bent over backwards to allow this issue to go to trial, is now being appealed for having committed error in this case. We don't reverse judgments on the irony, Doctor. I understand. But my other point is, and interestingly enough, there's no assignment of error whatsoever in this case to anything else Judge Scriven did at trial. Like I see in most of my appeals. The only error they ascribe to Judge Scriven is, you should have taken this away from the jury. There were not . . . That's all they have to ascribe to. Except that the standard would say that that would not be appropriate under the facts of this case, clearly. That's the issue they've presented. All they've got to do is present that issue. That's right. If they prevail on it, you lose, and that's what they've done. Thank you, Your Honor. The porch issue is even worse, and I'll just briefly discuss it. I think that's why I got off on that plea. I apologize for that. I do that all the time. The porch issue is much worse, because not only was it not ever pled, it wasn't discovered, it wasn't in the pretrial step, it wasn't in the trial briefs, it wasn't in the motion for judgment as a matter of law, the Rule 50 motion, it wasn't in the jury instructions ever requested by anyone, it wasn't mentioned in the closing, and the only time it really came up, other than Judge Scriven's questions, to Lieutenant Rudd once she figured out there was a porch at this house, which happened in the middle of trial. The argument then that occurred was due to a jury question that asked about the porch. In Volume 3 of the transcript of the trial, at page 3, we are advised that there's a question about the porch. I'm reading here, page 3, beginning at line 8. The first question is, by law, is the screened-in porch considered part of the house? The answer to that is no. I assume the parties agree. Plaintiff agrees. Mr. Marks, no, I don't agree. The court, well, has the plaintiff alleged in this case that the opening of the screened door was any part of the claimed incident? Mr. Marks, well, I mean, it wasn't. I'm sorry, Your Honor, we didn't specifically say screened door, but we said there was no consent to enter anything. By the way, that's not in the complaint anywhere. That's probably where I got off on it. She then let me argue, and then went back to Mr. Marks, as she was trying to fashion her response, and she said that she's going to tell the jury no, and his response is page 6 of volume 3, line 16. I just don't think that's the law. I just think it's irrelevant to their determination here ultimately, but I think you're telling them something that, you know, hasn't been briefed, and, you know, I'm pretty sure a screened porch with a door in it is in an enclosed area as part of the house, the court, and you're pretty sure to be wrong about that unless there's certain clear indicia that this is part of the living space of the house and there's been no evidence of it. So the porch issue, I hesitate to even call it a red herring. It is so far out there. Also out there is the suggestion that the summary judgment in favor of Sheriff Judd on whether or not he had a policy or custom encouraging or allowing warrantless searches without consent or exigent situations based on the General Order 74.3, which is in there, which is a model CALEA standard based on the Florida statutes. It even goes so far as to cite Peyton and say that you can't do a warrantless arrest in a home without consent or exigence. And then says you can. I'm sorry? And then says that you can. Okay. I didn't read that, Your Honor, but I think it does talk about arresting with probable cause. Yeah. It doesn't say anything about warrant. You can go in the house and arrest somebody with probable cause if you have probable cause. But it says it earlier. And, by the way, Well, then, a deputy may enter a suspect's premises to effect a lawful arrest in accordance with 901.15 Florida statute when the deputy reasonably believes the person to be arrested is within the premises. Right. That's a short version that thankfully is explained better when they actually make the Peyton cite later, I would submit. I think it's a model. They don't make it later. They don't. Peyton is an A, and then B says you can go in with probable cause. Thank you, Your Honor. By the way, Detective McKinney did testify to this at trial, and he clearly understood that he couldn't go in. I don't. Just if we can take a margin note, and I won't count this time against you, you apparently represent these people on more than an episodic basis in the sheriff's office. Yes, I'm proud to. I would wonder if it's occurred to you that maybe this needs clearing up so that we won't have future cases based on this problem. It's been revised actually several times since then prior to trial, and I am sure it's been taken care of already, Your Honor, although that's not part of my duties, thankfully. I wouldn't be qualified, but Ms. Gibson is, and thank you for that suggestion. But in this particular case, there's nothing whatsoever in the record that would suggest Sheriff Judd had a policy or custom that encouraged these types of arrests. Other than this general order, or order. Your Honor, I think the general order obviously needs clarification, and I'm sure that note has been written down. I understand, and lawyers sometimes make the mistake of exaggerating the strength of their position. And when you say there's nothing in the record, and this language is right there in the record, it seems to me like that's a gross exaggeration. I apologize for exaggerating to you, Your Honor. I was not intending to. I thought the policy was very good, and the fact that it even cited the patent was very strong. But I understand what you're saying, and I do understand that that doesn't fully explain the parameters of a warrantless arrest in the home, that portion of the policy. And if there are no other questions, I've got four seconds left. I'll be glad to address anything else if you need more time with me. I think you're ready for me to sit down. Thank you very much. That's no exaggeration. Mr. Marks, you've got three minutes. I think counsel misspoke about the conversation that the mother had with Mr. McKinney early that day. The testimony was clear in trial, and Mr. McKinney's testimony that the conversation was, will you bring your daughter down? She said, no. I said, had you made the decision to arrest her? Yes. Did you tell her that? No. He refused to tell that. He had made the decision, wanted her to come down. They had previously said, we're not bringing her down. If there is going to be an arrest, let us know. We'll turn her in. And what he did was he tried to have her come down to talk, which is not what he wanted. He was going to have her come down to arrest, not to talk. So that is incorrect. The issue about the porch, why it became an important issue was, Judge Scriven took over the questioning of the officer, and the officer said, we should knock on the screen porch. We knocked on the screen porch. We don't enter before we knock on the screen porch. They made a big issue about that, and the judge took over the testimony on that, and actually asked the questions. And then when the jury was back there, now we're telling them, by law, it's not part of the house. If anything, I was saying, just tell them it's not to be considered in this matter. But she's saying, by law, it just really misconstrued the entire trial, I think, really jeopardized it. I knew they'd come back within minutes once that happened, because it was the judge that made the big issue out of it. It was the defendants that made the big issue out of it. It was a very misleading answer, and in fact, it isn't by law, necessarily. In this case, it may not have been relevant. By law does not mean it was not part of the . . . But that's what the judge said. The judge said, no, not for this case, or something to that effect. But the question was, by law, is the screen porch part of the home? That was the question, by law. I don't know who put the by law. The by law is written in different handwriting than the rest of the question. It's in the record. I'm not saying anything is torrid about it. It's just I don't know who wrote the by law part and who wrote the rest of the question. So it was incredibly misleading. But anyway, to get back to the probable cause issue, if you look at the affidavit, and you look at what aggravated stalking is that is not sufficiently alleged in there, any material facts that would support an aggregated stalking charge against a 12-year-old minor. Mr. Campbell says that McKinney testified at trial that he had the warrant at the time of the arrest. Is that . . . There's no warrant. If that's what he testified, I don't remember that, but there was no warrant ever issued at any time.  What do you call it instead of a warrant? I mean, the two-page document is what I'm . . . We're talking about a charging . . . I'm sorry. It's a charging affidavit. It's attached to the complaint. Okay. This would be . . . they called this one. In this case, it's a . . . they just call it an affidavit. But so you agree that Officer McKinney had this at the time of the arrest? It appears that the affidavit, this two-page document, he had at the time of the arrest, or at least that's what he says. I don't have nothing to say otherwise. But if you look at this two-page document, it says, first of all, that you pointed out the acts happened on 10-14, which it didn't. And then you go to the second page. Between December 12th and February 13th, repeatedly and maliciously harassed the victim. There's no facts that say what that did, what happened. And there's nothing in here that actually seven months went by without any contact whatsoever. I mean, that's relatively misleading. I mean, how could you imagine seven months earlier, no contact, apparently she was having problems with other people, that that contributed to the suicide? And at the end, I mean, that's what he said. It has been determined through investigation that Blank committed suicide, da-da-da, and it has been determined the malicious harassment perpetrated by my client was a contributing factor. Where's that coming from? I mean, there's nothing in here to support any of that. Okay, counsel. We got your case. We'll take it under submission, stand in recess until tomorrow. Thank you. Thank you. Thank you for your help, Mike.